## Johnson v. Pilgrim Mutual Insurance Co.

*Alan E. Kear*, for plaintiffs.
*David N. Rosen*, for defendant.

BULLOCK, *J.*, November 6, 1978—Plaintiffs in this case are a fire adjustment company and owners of three properties which were damaged by fire, whom the adjustment company represented. Ms. Ruby Johnson owned a home at 2208 N. Colorado Street, Philadelphia, which suffered a fire on September 28, 1977. Mr. Henry Jenkins and Mrs. Lillian Jenkins owned a property at 4638 Hedge Street, Philadelphia, which was damaged by fire on January 12, 1978. Ms. Rosalie Reynolds owned a property at 2223 Madison Square, Philadelphia, which was burned on February 13, 1978. Mr. Andrew Dennis lived with Ms. Reynolds and owned personalty on the premises. All individual plaintiffs were insured with defendant, Pilgrim Mutual Insurance Company.

The complaint herein complained essentially that defendant was refusing to pay just claims because of the participation of plaintiff adjustment company and that it was interfering with the contractual relationship between the adjustment company and the other plaintiffs by discouraging individual plaintiffs from using the adjustment company and by attempting to deal directly with individual plaintiffs despite the representation of the adjustment company. Compensatory and punitive damages were requested, as well as equitable relief. On June 13, 1978, this court entered an order awarding both equitable relief and damages. Defendant excepted to the fact that the order was not in the form of an adjudication. The notes of testimony having been filed recently, we are now filing the within adjudication. We also note that plaintiff filed exceptions to the said order.

We believe the evidence substantiated the contentions of plaintiffs. We find the facts as we recite them hereinafter. With respect to the Johnson fire, defendant, shortly after the fire, sent Mr. Steven Dennis, an unlicensed contractor, to see Ms. Johnson. Mr. Dennis gave defendant a figure for which he would do the work, but was never authorized to proceed. When the adjustment company was engaged on or about October 12, 1977, it sought an itemized estimate of repairs from defendant, but one was never forthcoming.

With respect to the Jenkins fire, the owners engaged plaintiff adjustment company after defendant failed to do anything within two weeks after the fire. About a month after the fire, a representative of the adjustment company and a representative of defendant examined the premises. Thereafter, defendant offered $950 for the contents and nothing

for the building on the ground that the Jenkins did not own the building (a claim dropped after litigation was filed). Defendant sent to the Jenkins a check for $950 and a handwritten release relating to both building and contents. They turned these papers over to the adjustment company, which complained about the form of release. About this time they received a call from someone purporting to be Mr. Harry Iezzi, head of defendant's claim adjustment division, advising them they did not need to use the adjustment company. However, a second release and a check for $950 were thereafter sent to the adjustment company; again the release related to all claims from the fire. The release was not returned or the check cashed. Thereupon defendant sent an insurance agent to the Jenkins with a check for $403.92, representing a return of premiums on the realty and a release of claims as to the fire. The parties refused to sign.

With respect to the Reynolds-Dennis fire, a representative of defendant did not visit the insureds until about a month after the fire, by which time they had engaged the adjustment company. Sometime thereafter, a representative of defendant and a representative of the adjustment company appeared and inspected the property. No offer to pay for either property damage or contents was made. On or about March 9, 1978, Ms. Reynolds received a letter from defendant, signed by Mr. Iezzi, dated March 9, 1978, addressed to "Dear Customer" and stating, inter alia, "We are experiencing delay in adjusting a settlement on your fire claim at this time. Delay is due to an independent adjuster handling your claim," and discouraging the use of an adjuster.

We note that attached to the policy given to Ms.

Ruby Johnson was a pink card stating as follows:

"CAUTION:

"DO NOT SIGN ANY PAPERS OR BE MISLED by any outside parties asking you to sign any papers regarding, or in reference to any FIRE OR EXTENDED COVERAGE CLAIM due you on this policy.

"Any benefit or value payable under this policy can be obtained, without help or alleged influence of outside parties, through the Home Office of the Company. There is no need to pay anyone a fee for alleged services in collecting any sum which is rightfully due you. The Company wishes to pay every claim without delay and any representative of the Company will be glad to render assistance without cost to you.

"For your own protection, deal only with one of the following Company rpresentatives."

The appropriate proofs of loss were filed in all cases by the adjustment company. They were itemized and based on the figures of experienced adjusters. We are convinced, however, that with respect to none of these claims, did defendant make a reasonable effort to determine the fair value of the losses or to base an offer of settlement on any such figures. For example, Mr. Jasper, on behalf of defendant, went over the personalty loss of plaintiff Johnson and offered her $1,500 in settlement. When asked what his itemization came to, he was unable to answer. Plaintiff's counsel had to add up Mr. Jasper's figures which came to about $3,300. Mr. Iezzi, defendant's claims manager, apparently went around with checkbook in hand and made offers based on what the traffic would accept.

We conclude that defendant in this case never

made a good faith effort to settle the three claims and that the failure to do so was primarily a means to discourage the use by the individual plantiffs of an adjustment company. We note that defendant does not even claim that the adjustment company was unreasonable in its negotiation. What negotiation there was was between Mr. Ira Straff, of the adjustment company and Mr. Iezzi of defendant. Mr. Iezzi complained that Mr. Straff gave him a "hassle." Mr. Iezzi explained this as follows:

"BY THE COURT:

Q. Let me interrupt you. When you say, sir, that Mr. Straff was giving you a hassle, what exactly do you mean by that?

A. Because of my phone conversations with him, he became quite belligerent, cursing at me a couple of times and saying that I was to go and take my high blood pressure pills, and different derogatory—there just seemed to be a constant hassle.

Q. Did you feel that he made any unreasonable requests of you?

A. They weren't unreasonable, but it was the way that they were presented—the way that he more or less made you feel that you were nothing or just a scum."

We do not believe that Mr. Iezzi's approach was that of a reasonable person acting in good faith. We believe that after victimizing plaintiffs, he was attempting to appear as a victim himself. Moreover, we heard Mr. Straff testify at length. We do not believe that he cursed Mr. Iezzi or was belligerant, though we can assume he was frustrated.

We have not attempted to recite all the evidence in this case, the record of which is 613 pages. We believe, however, the record portrays a sordid and

shabby picture. People whose homes have been burned are always in a very unfortunate position. Poor people, who have no resources to make repairs and other living arrangements, are especially unfortunate. In dealing with companies they have paid to insure their properties against fire, they are in a very poor bargaining position. They are often forced, by the emergency of the circumstances, to accept whatever money is offered by the insurer, rather than insist upon a fair figure. This is especially so since such insureds are not likely to know just what they are entitled to. They can greatly benefit from the services of an adjustment company, which has the knowledge and personnel to determine what they are entitled to. Defendant, in our view, sought to penalize all the private plaintiffs herein for having hired the adjustment company. It did so, not only passively by not settling the claims, but actively by discouraging the parties from using an adjustment company, and by refusing, on some occasions, to accept the adjustment company as the legitimate representative of the individual plaintiffs. It clearly interfered with the business relationship between the adjustment company and its clients.

We note that defendant could have paid some money to individual plaintiffs on account, even if it considered there was a bona fide dispute as to the total proper sum due. This they did not do, despite the fact that they had reason to believe that all plaintiffs were people of very modest means. We believe that in various ways the conduct of defendant in this case was outrageous. We believe that its attitude toward its insureds herein was callous and oppressive, hardly consistent with the image of

concern and protectiveness which defendant sought to project to its insureds.

For the reasons indicated, by our order of June 13, 1978, we awarded damages, including punitive damages, to all plaintiffs. The said order is incorporated herein by reference. We also restricted the counsel fee payable by plaintiffs to a fee payable by the corporate plaintiff. The damage awards were made in light of such a restriction. We note that individual plaintiffs in this case did not freely select counsel, but were persuaded (not improperly) to use the corporate plaintiff's counsel.

The exceptions filed to the order of June 13, 1978, will be considered as exceptions to this adjudication. Any additional exceptions may be filed by either side within 20 days hereof. The prothonotary is directed to enter judgment in accordance with the provisions of the order of June 13, 1978, only in the event exceptions already filed or to be filed are hereinafter dismissed.

## ORDER

And now, June 13, 1978, the court, sitting in equity, after a hearing, finds in favor of all plaintiffs against defendant and orders as follows:

1. Defendant, Pilgrim Mutual Insurance Company, is permanently enjoined from

(a) attaching to any of its fire insurance policies the pink form attached to Exhibit P-2, or any other form cautioning or advising policyholders against employment of a public adjuster or other "outside parties" to represent them in enforcement of their rights under the policy,

(b) sending to any fire insurance policyholders

any letters in the form of P-20 or sending any other letters, or making any oral communications discouraging said policyholders from engaging public adjusters or condemning public adjusters in any way, or encouraging said policyholders to discharge any public adjuster already hired, or to make any settlement without the participation of any public adjuster already hired,

(c) interfering in any way with the relationship between plaintiff Insurance Adjustment Bureau and any of its clients.

2. Plaintiff Insurance Adjustment Bureau is awarded punitive damages in the sum of $7,500.

3. Plaintiff Ruby Johnson is awarded damages as follows:

| | |
|---|---:|
| (a) payable under insurance policies | $16,000.00 |
| (b) consequential damages | 3,600.00 |
| (c) punitive damages | 4,000.00 |
| TOTAL | $23,600.00 |

• • •

7. The defendant's counterclaim is dismissed.

In view of the circumstances of this case and the awards of damage made herein, it is directed that plaintiff Insurance Adjustment Bureau recover from plaintiffs, as contracted compensation, ten percent of sums designated as payable under the insurance policies and as consequential damages only. It is further directed that plaintiffs' counsel charge a fee for his services to Insurance Adjustment Bureau only, and not to the individual plaintiffs. If this litigation should become protracted, the court reserves the right at a later date to order defendant to pay an additional sum to plaintiff Insurance Adjustment Bureau as attorney's fees.

The prothonotary is directed, upon praecipe of any plaintiff, to enter judgment in favor of said plaintiff against the defendant.

## OPINION SUR EXCEPTIONS

BULLOCK, *J.*, February 27, 1979—Before us are plaintiffs' and defendant's exceptions to the adjudication of November 6, 1978, incorporating an order of June 13, 1978. This case was originally assigned to this court on May 1, 1978. At that time, plaintiffs did not seek preliminary relief, but sought a prompt final hearing. Since defendant had filed preliminary objections, the court requested briefs and set May 10, 1978, as the date for argument. On May 10, 1978, after argument, the court denied the preliminary objections and scheduled May 30, 1978, for a final hearing. At that time, defendant did not object to the scheduled date.[1] Final hearing was held on May 30, 1978, through June 2, 1978. An order was entered on June 13, 1978, and an adjudication incorporating the said order entered on November 6, 1978, following transcription of the record.

Plaintiffs, subsequent to the filing of defendant's exceptions, filed eleven exceptions to the adjudication and order of the court. In their brief, however, the exceptions were reduced to the following: (1) The court erred in not awarding compensatory damages to Insurance Adjustment Bureau;

---

1. The court has had transcribed and included in the record portions of the pretrial conferences of May 1, 1978, and May 10, 1978. The court advised counsel of its intention to do so in case counsel wished to have other portions transcribed and included.

(2) The court erred in not awarding compensatory damages for defamation to Insurance Adjustment Bureau; (3) The court erred in ruling that plaintiffs' attorney's counsel fees should be payable only by Insurance Adjustment Bureau; (4) The court erred in not awarding higher consequential damages; (5) The court erred in not awarding greater punitive damages; (6) The court erred in directing that plaintiffs' counsel fees be paid by Insurance Adjustment Bureau only; (7) The court erred in finding that the second release and check forwarded by defendant in the Jenkins' claim was sent to plaintiff Insurance Adjustment Bureau when it was in fact sent to the Jenkins.

Although plaintiffs submitted a brief, plaintiffs' counsel did not at oral argument argue these exceptions. We believe that plaintiffs' exceptions are without merit except for (7) in toto, and, to an extent, (1).

We believe that plaintiff Insurance Adjustment Bureau did in fact suffer actual damage, but that the precise amount was not developed at trial. At the very least, the adjustment company lost the fees it would have made from the other plaintiffs herein had the claims been promptly and fairly settled. Since the adjustment company's agreements show its fee to be ten percent of recovery, the loss would have been, by our computation, in excess of $4,000. We did not, however, award this sum as damages since, if judicial awards to the other plaintiffs are sustained, the adjustment company will then be able to recover its fees from the other plaintiffs. It is reasonable, moreover, to assume that defendant's activity had some negative effect on plaintiff adjustment company's business and we find that there was in fact actual damage to this

plaintiff. We are aware that the law ordinarily requires there be actual damages in order for there to be punitive damages, although this contention does not appear in defendant's brief. While finding the fact of actual damages, we are not inclined to speculate as to the amount. We would note, however, that loss of even a handful of cases could have resulted in loss of a sum in the thousands of dollars.

Defendant filed 30 exceptions, but briefed and argued only the following: (1) failure of the court to sustain defendant's preliminary objection that there was a misjoinder; (2) adequate remedy at law; (3) an unwarranted award of damages, including court's reservation of right to increase damages; (4) unwarranted amount of punitive damages; (5) improper injunction against defendant's attaching to its policy a notice advising against use of adjustment companies. In addition, in its history of the case and at oral argument the defendant argued; (6) that it had been prejudiced by the court's hearing the case as promptly as it did.

(1), (2). Defendant contends that instead of this one suit, there should have been four suits, one by Insurance Adjustment Bureau and three by the various plaintiffs based on the three fire insurance policies. Had the adjustment company sued individually, the proof would have had to be essentially what it was in this case, since the company's case was based partly on what occurred in its attempts to adjust the three claims. In such a case the individual plaintiffs herein would have had to testify simply as witnesses, rather than as parties. At the conclusion of such a proceeding, the court would have been unable to resolve the claims of the individual claimants. According to defendant, the individual plaintiffs, after testifying in the adjustment

company's case, should then wait the years it would take for their individual assumpsit actions to be heard. It is hard for us to imagine a situation in which complaining citizens would have more reason to consider the judicial system not only inadequate but nonsensical. Moreover, as a court ever aware of the judicial backlog and the need for economy of judicial time, we would highly disapprove a procedure whereby four trials were required instead of one.

Pa.R.C.P. 2229(a) provides as follows: "Persons may join as plaintiffs who assert any right to relief jointly, severally, separately or in the alternative, in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences if any common question of law or fact affecting the rights to relief of all such persons will arise in the action." We note that this rule does not distinguish between types of relief sought. It appears to have completely eliminated the various technical common law barriers to joinder in favor of a rule based entirely upon practicality. We note, moreover, Pa.R.C.P. 126 which provides as follows: *"Liberal Construction and Application of Rules*. The rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable. The court at every stage of any such action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties." We believe that our trial of all plaintiffs' cases together resulted in a just, speedy and inexpensive determination of all the issues involved without impairment of the substantive rights of defendant.

We have already noted that the adjustment company's case includes facts which are part of the cases of all the individual plaintiffs. Indeed, the essence of the company's case was proof of a pattern of conduct exemplified in part by the handling of the claims of the other plaintiffs. There are, moreover, common questions of law with respect to all plaintiffs, e.g., the interpretation of the common language of the fire insurance policies as to handling of claims and computation of sums due thereunder. Moreover, 7 Goodrich-Amram 2d §2229(a):1, 429, commenting on Rule No. 2229, states as follows: "Following the principle that all interested persons should be brought upon the record so that a final determination of the controversy in all its features might be made, equity has always permitted the joinder of separately entitled plaintiffs when future litigation could thereby be avoided."

Defendant contends that plaintiffs herein had an adequate remedy at law. The adjustment company, however, has asked that defendant be enjoined from interfering with its business relationship with its clients. Since injunctive relief was prayed for by the adjustment company, we do not understand how defendant can make such a contention. In its brief, defendant makes no effort to argue why the adjustment company should not be permitted to have its right to injunctive relief determined in equity. Moreover, once there was a basis for equitable jurisdiction, the court, we believe, was empowered to resolve all claims, including those for damages.

(3). Defendant's third contention is worded as follows: "The award of damages in the amount

thereof is unsupported by the specificity required by the pleadings, was not related in any way to the evidence presented by Insurance Adjustment Bureau and did not warrant a reservation of an award of an even larger amount if defendant excepts and continues to assert its rights." With respect to the first contention, we believe that the complaint was sufficiently specific.

The second contention appears to be that actionable interference with a business relationship was not established, because defendant was privileged and there was no proof of harm. Neither side has cited to us any cases factually similar to the present case. We see no reason, however, why defendant had a privilege to write the individual plaintiffs and discourage them from dealing with the adjustment bureau already engaged by them. This case dramatically demonstrates that defendant, in its dealings with poor and unsophisticated people, was less than fair in its dealings with them. We do not believe they were privileged to interfere with an arrangement their insureds made for their own protection in attempting to adjust their claims. Nor do we believe they could properly refuse to settle claims just because an adjuster was involved, in light of the fact that Mr. Iezzi, on behalf of defendant, conceded that the adjustment company was not unreasonable in handling plaintiffs' claims. Defendant's conduct, moreover, we believe resulted in harm to all plaintiffs. Individual plaintiffs were unable to collect what they were entitled to for their fire damage. The adjustment company was unable to make its fees for settling the other plaintiffs' claims and may well have lost business in addition. We did not, however, award compensatory damages to the adjustment company. We

awarded only punitive damages on the basis of what we considered defendant's "outrageous" conduct with respect to it. In our view, defendant was guilty of an intentional and unwarranted effort to destroy the adjustment company's business market in the subject area, an effort which was all the more offensive since it was obviously intended to facilitate defendant's settling claims for minimal amounts with its unsophisticated insureds.

On reconsideration, we are now inclined to agree with defendant that any reservation of right on the court's part to impose additional damages constituted a chilling effect upon defendant's right to challenge the court's adjudication. We will, therefore, modify our order accordingly.

(4). Defendant contends that the award of punitive damages in this case was improper. Punitive damages are defined in Focht v. Rabada, 217 Pa. Superior Ct. 35, 38, 268 A. 2d 157 (1970) as follows:

"Pennsylvania has adopted the rule of punitive damages as set forth in §908 of the Restatement of Torts and the comments thereunder. Section 908(1) provides: '"Punitive damages" are damages other than compensatory or nominal damages awarded against a person to punish him for his outrageous conduct.' Comment (b) to the above section states that 'Punitive damages are awarded only for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others.' See Chambers v. Montgomery, 411 Pa. 339, 344, 192 A. 2d 355 (1963). Thus, the Pennsylvania rule allows the awarding of punitive damages when the act is done with reckless indifference as well as with bad motive."

In our view, both bad motive and indifference

were involved in this case. Indeed, the indifference was "studied," which, in our view, is worse than "reckless." Defendant's motive was to prevent plaintiffs from being adequately represented in the settlement of their claims, with the ulterior motive of settling them with unsophisticated insureds for less than the fair amount a knowledgeable adjuster was likely to insist upon. The bad motive was effectuated by an equitably bad means, namely, simply refusing to settle the claims despite the deprivation resulting to the people whose homes had been burned. Defendant was clearly indifferent to the hardship it was causing the individual plaintiffs. Considering the relative positions of the insurance company and the poor unsophisticated plaintiffs, we regard defendant's conduct as an outrageous form of economic oppression, with all plaintiffs its targets.

(5). Defendant contends that the court improperly enjoined it from attaching to its policies a notice warning insureds against using adjustment companies. It contends essentially that this is an unreasonable interference with free speech. We consider, however, that the right of government to interfere with unfettered free speech in the area of businesses dealing with consumers is too obvious to require discussion. The question, we believe, is whether our injunction was reasonable. Defendant argues that the matter is simply one of business competition in which it and adjustment companies should be equally free to communicate with insureds. Recent history, however, has demonstrated that consumers were often abused by businesses, especially unsophisticated consumers. The trend of legislation has frequently been in the form of requiring consumers to be informed of their rights. In

this context, we believe that public policy requires that businesses not be permitted, at least with respect to certain consumers, to discourage or frighten consumers away from obtaining representation to protect their interests. Defendant suggests that its notice is simply a reminder to insured of the existence of the Act of June 22, 1931, P.L. 605, 40 P.S. §303, requiring adjusters to obtain signed contracts in proper form before acting. An examination of the notice herein, however, demonstrates otherwise; indeed, no reference is made to any adjustment contract. The clauses, "Do not sign any papers or be misled by any outside parties," "For your protection, deal only with one of the following Company representatives and there is no need to pay anyone a fee for alleged services in collecting any sum which is rightfully due you," clearly imply that engaging an adjuster would not be in the insured's best interests. Indeed, they suggest that adjusters would attempt to defraud them. We did not enjoin any language in the notice regarding what defendant itself would do, though these statements as to prompt fair settlements are not borne out by the facts of this case.

(6). Finally, defendant contends that it was pressed to trial with undue promptness, to its prejudice. Defendant, however, points to no facts from which it could be concluded that it was prejudiced. Moreover, the record of the pretrial conference of May 10, 1978, shows that defense counsel did not object at that time to the date set for trial or otherwise indicate he would be prejudiced. At oral argument, defense counsel indicated that he did not have an opportunity to take depositions of plaintiffs. Trial in this case, however, was set 20 days ahead at the preceding pretrial conference. De-

fendant did not make any effort to depose plaintiffs within this period. Defendant argues that the court improperly held a final hearing immediately following the filing of defendant's answer. Plaintiffs in this case regarded the matter as one of urgency and the court agreed. It is not the kind of case where preliminary relief could have served any purpose, nor did plaintiffs seek preliminary relief. They sought a prompt final hearing and the court granted it. Defendant has cited no authority for its contention that the action of the court was improper. Defendant has even suggested that the court prejudged the case and did not consider it impartially. We can only let the evidence speak for itself. At the pretrial conferences, much of the evidence was discussed. Plaintiffs' counsel made offers of proof, including documents, on the basis of which the court granted prompt hearing. At no time did defendant's counsel make any offers of proof in exculpation or extenuation. At this point, we note, nothing whatever had been paid to any insured. In our view, the evidence at trial proved to be even more unfavorable to defendant than originally suggested by plaintiffs' counsel.

## ORDER

And now, February 27, 1979, after having reviewed briefs and heard oral argument, the court dismisses plaintiffs' exceptions except that:

1. The court finds that plaintiff Insurance Adjustment Bureau suffered actual damage, but no specific award with respect thereto was made for reasons set forth hereinabove.

2. The court amends its factual findings and

finds that, with respect to the claim of Henry Jenkins and Lillian Jenkins, the second release and check were forwarded to the insureds and not to Insurance Adjustment Bureau.

The court dismisses defendant's exceptions except that:

3. The portion of the court's order of June 13, 1978, incorporated into its adjudication of November 6, 1978, which reads, "If this litigation should become protracted, the court reserves the right at a later date to order defendant to pay an additional sum to plaintiff Insurance Adjustment Bureau as attorney's fees" is hereby vacated.